IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 16, 2021

**STATE OF TENNESSEE v. KENNETH GEORGE ARNOLD**

**Appeal from the Criminal Court for Hamilton County**
**No. 296573     Barry A. Steelman, Judge**

_____

**No. E2020-00383-CCA-R3-CD**
_____

The defendant, Kenneth George Arnold, challenges his Hamilton County Criminal Court jury convictions of rape, aggravated sexual battery, and sexual battery by an authority figure, challenging the sufficiency of the convicting evidence and the imposition of consecutive sentences.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Carson William Fallo, Assistant District Public Defender (on appeal and at new trial hearing); McCracken Poston, Ringgold, Georgia (at sentencing); and Robert N. Meeks, Chattanooga, Tennessee (at trial), for the appellant, Kenneth George Arnold.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Neal Pinkston, District Attorney General; and Andrew Coyle and Brian Bush, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Hamilton County Grand Jury charged the defendant with two counts of rape, one count of aggravated sexual battery, and one count of sexual battery by an authority figure for offenses committed against the victim, his stepdaughter.

At the defendant's January 2019 trial, the victim, who was born on August 7, 1998, testified that her mother met the defendant after divorcing her father and moving in with the victim's grandparents in Chattanooga.  She said that her mother introduced the defendant to her and her brother shortly before the victim entered the sixth grade.  Shortly after introducing the defendant to the victim and her brother, the victim's mother began to

take the victim and her brother to spend the weekends with the defendant and his four children in the defendant's home. The victim testified that she trusted the defendant, who "tried to" act as a father to her by setting "rules, punishments, [and] chores." During this time, the victim's father lived and worked in Louisiana, California, and North Carolina.

The victim testified that on an occasion when she was visiting the defendant's home for the weekend with her mother and brother, she "was helping either [the defendant] or his son make a Facebook, and [the defendant] started off with just rubbing my back, trying to give me, like, a massage." The victim recalled that she was seated on the floor and that the defendant was seated on a chair. The defendant "eventually . . . went under my shirt, and he kept going down farther where my bottom is, and I squirmed and said 'no' or 'stop,' and he kept doing it." She confirmed that the defendant touched her "bare back" and her bottom "[u]nderneath the clothing." The victim said that the defendant "didn't go all the way down" but only to the "mid" part of her bottom so that "[h]is whole hand" was inside her pants. She testified that the defendant "[s]miled" and "giggled" when she told him to stop. The victim said that she did not tell anyone what the defendant had done because she "was young" and "didn't know what was going on and didn't understand it."

The victim testified that the defendant married her mother in July 2011, approximately "[e]ight months to a year" after the incident when the defendant touched her bottom and shortly before she turned 13. The defendant sold his house, and the newly-blended family moved in with the victim's maternal grandparents while they looked for "a house to fit all of us." Eventually the family moved into a house in Hixson. The victim said that, during that time, "a lot of rules or a lot of things were set because of [the defendant], and mom would go through him before anything, and every punishment or every rule that was being set was I guess what they both agreed on." She recalled that when she asked her mother's permission to do things, "[h]er response was that she would talk to [the defendant] and get back to me." The victim testified that when she asked the defendant's permission to do things, such as going to a friend's house or to a school dance, the defendant told her that "[f]or me to get what I wanted, he had to get what he wanted, and he told me what he wanted was what my mom wasn't giving him at the time." She said that, essentially, the defendant "wanted sexual favors out of it."

The victim testified that the defendant came into her bedroom "at night after my mom would be asleep" to "[t]ry to get his sexual favors." She recalled one incident when the defendant came into her room, took her hand, and forced her to "move [her hand] up and down on his" erect penis while his pants were off. She said that she told the defendant, "'I don't want to do this.'" The defendant ejaculated "[e]ither on me or in a towel" that he brought into her room. After this incident, the defendant permitted the

-2-

victim more freedom. She said that she did not tell anyone what had happened because she was "scared" and "embarrassed."

The victim testified that the defendant also "wanted to do sexual favors on me" and that "[h]e thought I would like it or thought I wanted it." On one occasion, the defendant came into her room and asked to perform oral sex on her. When she protested, the defendant told her, "'Don't do that. You're going to get in trouble. I'll tell your mom.'" The victim said the defendant's threat to tell her mother referred to "stuff" that the defendant had allowed her to do with her friends "that I don't think any parent would allow anybody to do." She recalled that the defendant "took my pants off and said that I would like it." The defendant then penetrated the victim's vagina with his fingers and performed oral sex on her. That same night, the defendant "masturbate[d] himself and then he put it . . . all over my belly."

The victim recalled that after each of their encounters, the defendant "would tell me he knew what he was doing was wrong, that it's not . . . godly of him, it's not what a father would do, and then he would do it again." The victim said that the abuse only "stopped when he confessed to my mom" in 2013. Her mother "was mad" and asked the victim if she wanted the defendant out of the house. The victim testified that she told her mother not to kick the defendant out because she was afraid of what might happen to her. She said that she was also afraid that she might be blamed.

At some point, law enforcement officers approached the victim at school and "asked me if I was having sex with my stepdad, and I answered it truthfully and said no, we were not having sex." She testified that she did not tell the officers about the other sexual abuse by the defendant because "[t]hey didn't ask." Approximately two weeks after the defendant revealed the abuse to her mother, the victim went to stay with her boyfriend, referring to him as her "safe spot," because she "didn't want to go home." She recalled that her mother was pregnant with the defendant's baby at that time. Eventually, the defendant and the victim's mother came to her boyfriend's house, and the victim "had a mental breakdown." The victim recalled that her mother telephoned her father "and said that she didn't know what was wrong with me, that I was going crazy and I couldn't calm down. They took my car away from me. My dad came two days later and got me." The victim moved in with her father in North Carolina.

The victim testified that a "[c]ouple months after" she moved to North Carolina, the defendant wrote her a letter saying that "[h]e was sorry that he lost my trust, ruined the relation[ship] with me and my mom." The letter was exhibited to her testimony, and she read portions of it. In the letter, the defendant apologized for "destroy[ing] your trust."

During cross-examination, the victim testified that the defendant told her "[t]hat he was sexually abused, he was hit, he was beat."

The victim's mother testified that she divorced the victim's father in 2008 and moved in with her parents in Chattanooga. She met the defendant via an internet dating service in 2009. The couple communicated electronically "for probably a month" before meeting in person. The victim's mother introduced the defendant to her parents and to her children, the victim and the victim's twin brother, at church in May 2009. She said that after she had dated the defendant "for about a year," she began to spend weekends at his home; her children went with her "[s]ometimes." The victim's mother testified that she and the defendant married in July 2011 and that the defendant sold his house around this same time. The defendant and his children moved into the house the victim's mother shared with her children and her parents. After approximately three months, the victim's mother and the defendant moved with their children into a house in Hixson.

During the time that the family lived in the Hixson residence, the victim's mother was "kind of a strict parent" while the defendant "was a more laid-back parent" who was "more like friends" with the children. She said that she consulted with the defendant on parenting decisions regarding the victim and her brother because the defendant was "my husband and supposed to be head of my household." The defendant, however, generally "made decisions without me" regarding his own children. The victim's mother recalled that the defendant disclosed to her in December 2012 that he had touched the victim inappropriately. On the day of the disclosure, she went into the garage where the defendant was working because she "could tell just by his demeanor and his actions" that "something was wrong, something was bothering him." She said that she believed the defendant "was struggling with work." The defendant agreed to talk, but he asked her to take a ride with him to the parking lot of a nearby store. As they sat in their car, the defendant said "[t]hat he had inappropriately been with" the victim, "that he was inappropriately touching and looking at her." The victim's mother said that "that was just the final hit. I thought I was going to throw up right there." She demanded that the defendant take her home.

The victim's mother testified that the defendant drove them home and that she warned him "to stay away" from the victim "until I made a decision." She spoke with the victim on the following morning, but the victim "was upset" and "didn't really want to talk about it much." The victim's mother could not "remember exact words that we had, but, you know, she didn't, she didn't want me to kick him out at that moment." The victim confirmed the defendant's claim that "'it hadn't happened lately.'" The victim's mother said that she and the victim "kind of just made the decision that we were going to try to move forward." She added that the victim "was very scared about people knowing, afraid of, you know, what would happen if people knew, how would they look at her, just kind of

wanting to move past it and move forward." The victim's mother said that the victim moved in with her father in October 2014 and that the defendant remained in the home until December 2014, when she "made him leave." Over time, the defendant revealed that his abuse of the victim "started before we even got married, from inappropriately, like, rubbing her back, going down her backside onto her bottom." He told the victim's mother "[t]hat he masturbated while, like, rubbing [the victim] or touching her either in her vagina or on her breast" and that he ejaculated "onto [the victim's] stomach." He also told her that he had performed oral sex on the victim and that he had asked the victim to perform oral sex on him, "but she said no."

The victim's mother said that she did not disclose the abuse to the police because the victim "didn't want anybody to know. We tried to keep it within our family." The victim's mother became pregnant with the defendant's child in the latter part of 2013, and the child was born in June 2014. She eventually reported the abuse in February 2015.

During cross-examination, the victim's mother said that the defendant told her that he had been abused as a child but did not disclose "the extent of how many times or who it was." The victim's mother agreed that the victim did not report the abuse to her. She also agreed that the victim told child services officials that she and the defendant did not have sex, by which the victim meant that the defendant had not penetrated her vagina with his penis. The victim's mother denied encouraging the victim not to report the abuse but admitted that she "personally did not turn [the defendant] in." She acknowledged that the victim continued to live in the family home with her and the defendant for "[a]lmost two years" following the disclosure of the abuse. She denied, however, that the defendant was ever alone with the victim after the revelation.

Hamilton County Sheriff's Department Sergeant Robert Lee testified that he investigated allegations that the defendant had sexually abused the victim. Upon being assigned to the case, Sergeant Lee set up a meeting with the defendant and the defendant's attorney. A video recording of Sergeant Lee's interview of the defendant was exhibited to Sergeant Lee's testimony and played for the jury. During the interview, the defendant admitted that he first touched the victim inappropriately while he and the victim's mother were dating, saying that he "touched her backside" inside of her clothing. The defendant said that he also touched "her genitals" on the outside of her underwear and asked to see her breasts. The victim displayed her breasts to the defendant after he "talk[ed] her into it." The defendant told the detectives that he thought the victim was "maybe being flirty or trying to form a relationship" with him. The defendant said that after he married the victim's mother and the family moved into the new house, the victim began coming to him "directly" when "she wanted to do things and go places" and that he asked her "what's in it for me." He said that the victim "manipulated" him so he "manipulated back" and that the two "worked a deal out and . . . she was able to, you know, kind of had my vote . . .

-5-

about going places or doing things" and, in return, "she kind of agreed to . . . like masturbate . . . me." He explained that "that was, you know, kind of the way the deal sort of started working out."

The defendant told the detectives that the first such transaction occurred after the victim asked for something while they were at the mall. He told the victim that "we can't afford that . . . but I can afford it if you'll do this," meaning if she would masturbate him. The victim masturbated him using her hand while they were in her bedroom. Thereafter, he "would present it" when the victim asked to do "normal things" that she thought her mother might not agree to like going out with her friends. The defendant said that he "pressed" the victim to allow him to perform oral sex on her. He added that she "wasn't obviously, like, majorly comfortable with agreeing to it." He recalled two or three occasions when the victim agreed to stand in the doorway naked while he masturbated. The defendant insisted that he and the victim did not have sexual intercourse "whatsoever." He also denied having penetrated the victim's vagina with his finger.

The defendant told the detectives that the victim did not want her mother to find out because she believed her mother would be angry with her. The defendant said that the abuse continued even after he told the victim he would stop. He said that it was difficult for him to resist because the victim "continued to come to me for stuff," adding that he felt as though the victim was using him. The defendant told the detectives that he only recalled waking the victim to perform sexual acts on two occasions. On one occasion, he performed oral sex on her. On another he "asked her if he could masturbate on her" while she lay in her bed naked from the waist down. He said that on that occasion he ejaculated "just a little" onto the victim's stomach. The defendant said that the abuse stopped after he confessed it to the victim's mother.

During cross-examination, Sergeant Lee described the defendant as "unique. He was honest. He seemed to be very honest, remorseful."

The State rested, and following a *Momon* colloquy, the defendant elected not to testify but chose to put on proof.

Doctor Robert J. Brown, Jr., a forensic psychologist, testified that he spent "well over 20 hours" interviewing, observing, and testing the defendant to determine whether the defendant was competent to stand trial. Although Doctor Brown initially concluded that the defendant was not competent, Doctor Brown was able to restore the defendant's competency. Doctor Brown diagnosed the defendant with post-traumatic stress disorder, attention deficit hyperactivity disorder, and an anxiety disorder that originated from the "sexual abuse that he sustained from approximately age three until just before he became a full-fledged adolescent." Doctor Brown also concluded that the

defendant suffered an "anoxic traumatic brain injury from those episodes where he was placed in the freezer with insufficient oxygen" by his older stepbrother. Doctor Brown testified that the defendant's mental diseases and defects rose to the level of "diminished capacity" "[c]linically, without question" but only on "two of the four prongs" "legally." He determined that by the time the defendant confessed to sexually abusing the victim, he understood the wrongfulness of his conduct.

During cross-examination, Doctor Brown acknowledged that the defendant was competent to stand trial and that an insanity defense could not be supported. Doctor Brown conceded that "[f]rom the standpoint of clinical perspective, yes, there are diminished capacities, but in reference to legal definition, no." He admitted that the defendant "knows that he did it intentionally and that it was wrongful" but then claimed that he could not say that the defendant intentionally engaged in the various activities with the victim. He also claimed that he could not determine whether the defendant had acted knowingly "because I don't have a date. I don't have a timeline as to when this transpired." Eventually, Doctor Brown acknowledged that the defendant possessed the capacity to act intentionally or knowingly but lacked the capacity to intentionally or knowingly inflict harm on the victim.

The defendant's sister, Lorrie Edwards, testified that their mother remarried when they were young and that their older stepbrother abused them both "violently and sexually." She said that the stepbrother "would put [the defendant] in the freezer and take him out and I thought he was dead at the time." The stepbrother would then engage in sexual intercourse with the unconscious defendant. Ms. Edwards testified that, as a result of this abuse, the defendant struggled with his memory and that she had to assist him in performing daily tasks. She said that the defendant had been under the care of a psychiatrist for most of his life.

During cross-examination, Ms. Edwards said that the defendant came to her and reported that he had done something wrong and that he eventually told her that it involved the victim.

Based upon this evidence, the jury convicted the defendant as charged of aggravated sexual battery in Count 1, sexual battery by an authority figure in Count 2, and rape in Count 4 but acquitted him of rape as charged in Count 3. Following a sentencing hearing, the trial court imposed concurrent sentences of nine years for the defendant's convictions of rape and aggravated sexual battery, to be served at 100 percent by operation of law. The court imposed a sentence of four years, to be served at 30 percent, for the defendant's conviction of sexual battery by an authority figure and aligned that sentence consecutively to the others, for a total effective sentence of 13 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence and the imposition of consecutive sentences.

## I. Sufficiency

The defendant first asserts that the evidence was insufficient to support his convictions, arguing generally that "the State relied entirely upon unreliable witnesses" and specifically that the State failed to establish that the defendant was an authority figure under the terms of Code section 39-13-527. The State contends that the evidence was sufficient.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim" when "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent." T.C.A. § 39-13-503(a)(2). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual battery by an authority figure is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age" and "[t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." *Id.* § 39-13-527(a)(1), (3)(B).

-8-

"Sexual contact" includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

*Id.* § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

We may not indulge in the defendant's invitation to reevaluate the credibility of the witnesses or revisit inconsistencies in the testimony because both lay solely within the purview of the jury as the trier of fact. *See Cabbage*, 571 S.W.2d at 835. The evidence adduced at trial established that, before he married the victim's mother, the defendant touched the victim on her naked bottom under circumstances from which a rational jury could conclude that he had done so to satisfy his desire for sexual gratification. The victim testified that, after the defendant married her mother, he required that she perform "sexual favors" in exchange for his permission to engage in activities with her friends. The defendant acknowledged the transactional nature of their relationship to the police, saying that he intervened for the victim with her mother in exchange for her masturbating him, his masturbating on her, and his performing oral sex on her. Although the victim's mother testified that the defendant acted as more a friend than a father to the victim, she also testified that he was involved in all the parenting decisions. The victim testified that she had to ask the defendant permission to socialize with friends. This court has previously held that a finding of parental or custodial authority is not contingent upon the defendant's being the biological parent or legal custodian of the victim. *See, e.g., State v. Robert M. Deunes-Cruz*, No. M2011-00879-CCA-R3-CD, slip op. at 13 (Tenn. Crim. App., Nashville, Jan. 7, 2013) (finding evidence sufficient to sustain conviction of statutory rape by an authority figure where defendant was victim's stepfather). The evidence presented at trial was sufficient to sustain the defendant's convictions of aggravated sexual battery, sexual battery by an authority figure, and rape.

## *II. Sentencing*

Finally, the defendant contends that the trial court abused its discretion by using essential elements of the conviction offenses to support the imposition of consecutive sentences under the terms of Code section 40-35-115(b)(5), "creating a 'double enhancement' scenario in which a defendant is twice punished for the same offense." The State asserts that the court did not err, noting that this court has previously considered and rejected an argument identical to that presented by the defendant.

At the January 2020 sentencing hearing, the victim's stepmother testified that the victim came to live with her and her husband in October 2014 and that neither she nor her husband was "real sure" why the victim came to live with them. She testified that the victim's mother essentially told them to come and get the victim because she was out of control. The victim's stepmother said that, before coming to live with her and her husband, the victim told her, "'If you leave me here, I'm going to kill myself.'" The victim's stepmother recalled that as they left to take the victim back with them, she and the victim's father shook hands with the defendant and thanked him "and [he] smiled and shook [his] hand back and said that we were welcome."

The victim's stepmother said that between October and December 2014, the victim "was just really out of control. She was angry, she was sad, I think confused, overwhelmed." She recalled that the victim lied, snuck out of the house, drank alcohol, and generally "had a very nasty attitude." In December 2014, a woman from child protective services came to their home and told them that the victim "had been molested by her stepfather." When they asked the victim about the allegation, the victim "felt very guilty. She kept apologizing . . . and she just went into a downward spiral." The victim's stepmother said that after her forensic interview, the victim "was upset, crying, distraught" as well as "embarrassed, humiliated."

The victim's stepmother testified that the victim began going to "therapy three times a week" "within the next two weeks" after her forensic interview. The victim continued to go to therapy three times a week for "two and a half to three years." She said that, at the time of the sentencing hearing, the victim was in therapy twice a week. The victim's stepmother explained that the victim had trouble sleeping and that she had panic attacks. She said that the victim took medication for depression and anxiety. She said that the victim had "turned against God" because "she does not understand how a godly person, like [the defendant] was supposed to be, doing something so ungodly to a child." The victim did not attend the sentencing hearing because she could not bear to look at the defendant.

The victim's stepmother testified that the victim's issues "almost ended the marriage" with the victim's father. She said that discovering the defendant's abuse of the victim had "broken" the victim's father. She added that the victim's father "is so angry. He is helpless. He is very heartbroken." The victim's stepmother testified that the victim's twin brother refused to speak to the victim "for two years, he was so angry. He was so upset. He didn't know who to believe." The victim's twin brother was also in therapy.

The victim's stepmother read aloud a letter from the victim's paternal grandmother. In the letter, the victim's grandmother stated that the defendant's conduct

-10-

had done "a great job in almost destroying a relationship between twins, causing distress to my son and his wife as they have tried to mend our family back together. You almost destroyed them." She said that the "poor" victim had been "ripped from her friends, how awful, not to mention the fact that she had to leave her mother."

Doctor Joseph Martin, director of a men's ministry program, testified on behalf of the defendant that he had gotten to know the defendant when he "was a ministry leader at Metropolitan Tabernacle." He said that the defendant joined his men's ministry group and that it was through this group that the defendant first divulged that he had been abusing the victim. Doctor Martin said that the defendant's confessing his behavior was "a huge sign" that he had accepted responsibility for his actions.

During cross-examination, Doctor Martin said that if the abuse "was ongoing," he would have reported it. He said that it was his recollection that the defendant lived alone at the time he disclosed the abuse to Doctor Martin.

The defendant asked the court to consider in mitigation the fact that, absent his own disclosure, the abuse might not ever have been discovered. He also asked the court to consider the fact that the defendant had "accepted his responsibility and he has, unfortunately, fell into a very difficult situation and had a trial that he should not have had, and had he been better advised, . . . this case would have been resolved in a plea."

The State asked the trial court to align the defendant's sentence for his conviction of sexual battery by an authority figure consecutively to the sentence imposed for his conviction of aggravated sexual battery under the terms of Code section 40-35-115(b)(5), which permits consecutive alignment of sentences for convictions involving the sexual abuse of a minor.

The trial court deemed it "significant" that the defendant had self-reported the abuse. The court noted, however, that the record established "an extensive pattern of abuse" that progressed in severity over a course of years. The court observed that the victim experienced "continuing anxiety and emotional harm . . . as a result of the defendant's acts." The court noted that it wanted to "be careful to make sure" that it did not use the essential elements of the convictions offenses to enhance the sentence. The court found that "the anxiety and harm, mental anguished that has been experienced" by the victim as well as the period of undetected sexual activity supported partially consecutive alignment of the sentences. The court also found that the abuse was extensive and encompassed acts for which the defendant had not been convicted. The court concluded that "the violation of an adolescent minor is a horrible act that doesn't just harm that person at that moment, but stays with that person." Based upon these findings, the court imposed concurrent sentences of nine years each for the defendant's convictions of

-11-

rape and aggravated sexual battery, to be served at 100 percent by operation of law, and a sentence of four years for his conviction of sexual battery by an authority figure. The court ordered the defendant to serve the four-year sentence consecutively to the nine-year sentence, for a total effective sentence of 13 years' incarceration.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

The standard of review adopted in *Bise* "applies similarly" to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). In *State v. Wilkerson*, the supreme court held that the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct before utilizing the "dangerous offender" category to impose consecutive sentencing, *see State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995), and "[t]he adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement," *Pollard*, 432 S.W.3d at 863.

In our view, the record supports the sentencing decision of the trial court. The trial court imposed partially consecutive sentences based upon its application of Code section 40-35-115(b)(5), which permits the imposition of consecutive sentences when

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of

the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

T.C.A. § 40-35-115(b)(5). The record reflects that the trial court carefully and thoughtfully parsed the evidence at trial and the sentencing hearing to determine that the defendant's conduct met the requirements of Code section 40-35-115(b)(5). The record establishes that the defendant used his position as the victim's stepfather to coerce the minor victim into engaging in a series of sexual acts progressing in vulgarity, over a period of years, resulting in serious emotional trauma to the victim and to her family.

The defendant does not contend that his offenses do not meet the requirements of the statute, and, indeed, the record supports a finding under this Code section. Instead, he argues that using factors that are essential elements of the conviction offenses allows an improper double enhancement. First, we observe that although Code section 40-35-114 bars the application of any enhancement factor that is "already an essential element of the offense," T.C.A. § 40-35-114, Code section 40-35-115 contains no such restriction, *id.* § 40-35-115; *see also State v. Bennie E. Massey*, No. M2009-00824-CCA-R3-CD, 2011 WL 662276, at *12 (Tenn. Crim. App., Nashville, Feb. 9, 2011) ("Although Tennessee Code Annotated section 40-35-114 prohibits the use of an 'essential element of the offense' as an enhancement factor, the consecutive sentencing provisions . . . contain no such prohibition."); *State v. Manual Haynes*, No. W2009-00599-CCA-R3-CD, 2010 WL 2473298, at *8 (Tenn. Crim. App., Jackson, June 17, 2010) ("Our supreme court has allowed consecutive sentencing based on conduct that constituted an element of the offense."). Instead, that section mandates that courts use "the criteria in this section" when making sentence alignment decisions and permits the imposition of consecutive sentences when "the court finds by a preponderance of the evidence" any of the eight criteria listed in subsection (b). T.C.A. § 40-35-115(a).

Second, to adopt the defendant's reading of the statute would be to render it useless in those cases when the defendant has committed multiple sexual offenses for which the victim's minority is an essential element when the history of the (b)(5) factor establishes that those are precisely the cases the statute is designed to address. Code section 40-35-115(b)(5) traces its origins to *State v. Taylor*, 739 S.W.2d 227 (Tenn. 1987). In *Taylor*, our supreme court observed that some cases involving the sexual abuse of a minor did not fit within the existing criteria for consecutive sentencing even though the facts "of those cases fully justified the imposition of consecutive sentences" and concluded that "it is necessary and appropriate to supplement the" then-existing criteria for discretionary consecutive sentences "with one applicable to defendants convicted of two or more statutory offenses that involve sexual abuse of minors." *State v. Taylor*, 739 S.W.2d 227, 230 (Tenn. 1987). Taylor's convictions of aggravated rape related to his committing "sex acts upon his own daughter, consisting of oral sex, anal and vaginal intercourse" when she

-13-

was between four and seven years old, and her minority was an element of the offense of aggravated rape at the time of Taylor's conviction. *Id.*; *see* T.C.A. § 39-2-603(a)(4) (1982) (repealed).

Because the statute contains no express prohibition on using factors that constitute elements of the offense to support the imposition of consecutive sentences and because the history of Code section 40-35-115(b)(5) supports its application where the victim's minority is an element of the offense, we affirm the sentencing decision of the trial court.

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE